UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

GREAT AMERICAN ASSURANCE
COMPANY, a foreign corporation,

       Plaintiff,

v.                         Case No. 8:10-cv-2568-T-33AEP

SANCHUK, LLC, a Florida
corporation, and CHUCK ELLIOTT,
a Florida citizen,

       Defendants.

_____/


SANCHUK, LLC, a Florida
corporation, and CHUCK ELLIOTT,
a Florida citizen,

       Counter-Plaintiffs,

v.

GREAT AMERICAN ASSURANCE
COMPANY, a foreign corporation,
and WELLINGTON F. ROEMER
INSURANCE AGENCY, INC., a
foreign corporation,

       Counter-Defendants.

_____/

### ORDER

     This matter came before this Court for a non-jury trial on September 10-11, 2012. (Doc. ## 142-143). On October 11, 2012, the parties timely filed their proposed findings of fact and conclusions of law (Doc. ## 151-152), as ordered by this Court.

Having considering the evidence and applicable law, the Court grants judgment in favor of Plaintiff/Counter-Defendant Great American Assurance Company and against Defendants/ Counter-Plaintiffs Sanchuk, LLC and Chuck Elliott. The Court's findings of fact and conclusions of law are set forth below pursuant to Federal Rule of Civil Procedure 52(a).

## I.   Background and Procedural History

Great American insured Sanchuk under a Non-Trucking Liability Policy with a Trucking or Business Use Exclusion. (Doc. # 1 at ¶¶ 12-13). On August 17, 2010, Elliott was operating Sanchuk's 2006 Volvo tractor "under load," hauling cargo for business purposes, when he was injured in an accident. He sought uninsured motorist (UM) coverage under the Policy. (Id. at ¶¶ 9-11). Great American denied coverage based upon the Policy's Trucking or Business Use Exclusion. Great American then filed suit on November 16, 2010, seeking declaratory judgment that it is not obligated to provide Elliott with UM coverage. (Id.)

Sanchuk and Elliott filed a Counterclaim (Doc. # 9) on April 18, 2011, and an Amended Counterclaim (Doc. # 22) on June 23, 2011. Sanchuk and Elliott asserted five counts against Great American: policy reformation (Count I), promissory estoppel (Count II), oral contract (Count III),

uninsured motorist benefits (Count IV) and attorney's fees (Count VI). On January 23, 2012, this Court entered an order (Doc. # 61) granting Great American's Motion to Dismiss (Doc. # 32) as to Count III of the Amended Counterclaim. Great American's Motion was otherwise denied.[1]

The parties filed cross motions for summary judgment (Doc. ## 91, 96), which this Court denied on July 30, 2012 (Doc. # 112). This case proceeded to a non-jury trial on September 10-11, 2012.

## II.  Findings of Fact

The Court makes the following findings of fact. To the extent that any findings of fact might constitute conclusions of law, they are adopted as such.

1.  Chuck Elliott has been in the tractor trailer trucking business since 1992. He began driving trucks under contract for Sherwin Williams in 1996. (Trial Tr. Sept. 10, 2012, at 96:1-8; Trial Tr. Sept. 11, 2012, at 22:5-9, 23:13-14).

---

[1]  The Amended Counterclaim also asserted negligent failure to procure insurance coverage against Wellington F. Roemer Insurance Agency, Inc. (Count V). The Roemer Agency filed a Motion to Dismiss the Amended Counterclaim (Doc. # 24) on July 5, 2011. On January 23, 2012, this Court entered an Order (Doc. # 61) granting Roemer's Motion to Dismiss and dismissing Count V without prejudice.

2.  Sherwin Williams provides liability insurance coverage to its drivers while the drivers are operating "under load," hauling cargo for business purposes. (Trial Tr. Sept. 10, 2012, at 194:16-20). Sherwin Williams requires its drivers to obtain "bobtail and deadhead" non-trucking liability coverage. (Joint Ex. 1, at 6). "Bobtail" refers to when a truck is operated without a trailer, while "deadhead" refers to when a truck is operated with a trailer but without a load. (Trial Tr. Sept. 10, 2012, at 64:21-24).

3.  When Chuck Elliott first began working for Sherwin Williams, he drove his brother George's truck and relied upon George's non-trucking liability coverage. (Id. at 96:10-12, 192:22-193:10).

4.  In 2009, Chuck Elliott and his fiancée Sandra Rodholm purchased a 2006 Volvo tractor under the corporate name Sanchuk. (Trial Tr. Sept. 11, 2012, at 16:24-17:4, 22:17-23:8). Dave Black, an employee at the Volvo dealership, referred Elliott to the Wellington F. Roemer Insurance Agency. (Id. at 24:4-8). On November 16, 2009, Black contacted Kim Kastel, a Roemer employee, on Sanchuk's behalf. (Trial Tr. Sept. 10, 2012, at 120:19-21; 121:15-19; 123:2-6).

5.  The Roemer Insurance Agency is an insurance broker that
    sells policies for numerous insurance companies. (_Id._ at
    60:11-24; 217:8-10). The Roemer Insurance Agency has an
    agency agreement with the Agriculture Insurance Company,
    part of the Great American Insurance Group, which gives
    The Roemer Insurance Agency limited binding authority to
    write policies that are within Great American's rates and
    guidelines and reported to Great American within 72 hours
    of the binder's effective date. (Joint Ex. 3). The Roemer
    Agency cannot otherwise bind policies without obtaining
    prior consent from Great American, and did not obtain
    that consent as to Sanchuk's Policy. (John Ex. 3; Trial
    Tr. Sept. 10, 2012, at 244:1-9).

6.  The Roemer Insurance Agency sells non-trucking policies
    for companies such as Progressive Insurance and Sentry
    Insurance as well as Great American. (Trial Tr. Sept. 10,
    2012, at 60:25-61:8).

7.  Kastel only works with operators of trucks under lease to
    motor carriers. (_Id._ at 117:13-18). She testified that
    she works with her potential customers to determine what
    type of coverage they need. (_Id._ at 126:20-127:2).

8.  Elliott spoke with Kastel six to eight times over the
    course of about three weeks to arrange coverage. (_Id._ at
    99:10-18). He first contacted her on November 19, 2009,

-5-

and requested $1 million in liability coverage and $1 million in UM coverage. (Id. at 97:13-20; Trial Tr. Sept. 11, 2012, at 26:10-21). Rodholm, who owned Sanchuk, was present during this phone call but only heard Elliott's side of the conversation. (Trial Tr. Sept. 10, 2012, at 266:20-21).

9.  Rodholm testified that Elliott told Kastel he never drives bobtail. (Id. at 266:22-23). Elliott testified that he told Kastel he drove his car to the Sherwin Williams plant in Orlando, drove the truck from the plant to Pennsylvania, uploaded and returned. (Trial Tr. Sept. 11, 2012, at 25:11-21). In light of that, he testified that he "had no need for bobtail" coverage and further testified that had Kastel stated she could not provide coverage while he was under load he would have attempted to obtain such insurance from another company. (Id. at 27:21-25).

10. Elliott later admitted during cross-examination that his contract with Sherwin Williams required him to obtain bobtail and deadhead insurance and that he wanted to comply with his Sherwin Williams contract. (Id. at 41:25-42:5, 57:13-19).

11. Elliott testified that Kastel stated he would be fully covered and she would get the right policy for him. (Id.

-6-

at 42:13, 43:19-44:1). Kastel testified that she sells non-trucking policies all the time and follows a standard procedure when speaking with potential customers. (Trial Tr. Sept. 10, 2012, at 125:8-13).

12. Kastel testified that she would first have asked Elliott if he was under lease to a motor carrier, in which case he generally would need a non-trucking liability policy. (Id. at 129:21-25, 130:19-21). She stated that some potential customers only operate their trucks while under load but still purchase non-trucking policies because their motor carrier requires it. (Id. at 150:23-151:5, 255:11-21).

13. Kastel testified that she would not tell anyone that a non-trucking liability policy provides coverage regardless of how the truck is used because that is not true. (Id. at 173:18-24). She further testified that she never sells primary liability policies to independent contractors, would not have sold Sanchuk something that did not apply to its needs, and would have informed Elliott had he requested a type of policy she could not sell. (Id. at 126:9-15, 132:20-22).

14. Rodholm testified that she only spoke to Kastel on two occasions, the first time to authorize Kastel to speak

with Elliott and the second time about sending the premium payment. (Id. at 85:19-86:1). She has no knowledge of what type of insurance The Roemer Insurance Agency was authorized to sell, or what Kastel told Elliott about the insurance. (Id. at 87:11-17, 89:11-13, 91:14-22).

15. On November 19, 2009, Kastel emailed the Policy application to the Defendants. (Id. at 123:18-23, 161:2-6). Elliott saw that the application contained $20,000 instead of $1 million in UM coverage and asked Kastel to increase the amount. That same day she emailed an updated application with the increased limit. (Id. at 124:6-9, 156:11-23, 162:1-3; Trial Tr. Sept. 11, 2012, at 10:4-22). She also attached an application for occupational accident coverage. (Joint Ex. 4).

16. When the coverage was increased from $20,000 to $1 million the overall premium did not change. (Trial Tr. Sept. 10, 2012, at 158:10-13).

17. Although Chuck Elliott requested information about occupational accident coverage and obtained the application for that type of coverage from Kastel, he ultimately decided not to purchase the coverage because he could get it cheaper elsewhere. (Id. at 135:13-14,

-8-

137:16-24, 246:17-25; Trial Tr. Sept. 11, 2012, at 54:25-55:15). Kastel and Rocky Roemer both testified that occupational accident coverage would have provided coverage in the event Elliott sustained a work-related injury such as the one before this Court. (Trial Tr. Sept. 10, 2012, at 135:16-18, 238:8-15).

18.  Elliott continued to revise the application, adding his brother George as a driver and changing the named insured to Sanchuk. (Id. at 124:23-125:1, 162:7-11). Kastel prepared new quotes based upon these changes. (Joint Ex. 5-6).

19.  On December 17, 2009, Kastel sent another version of the application to the Defendants via email, and asked the Defendants to check it for accuracy. (Joint Ex. 8). The application again incorrectly listed the UM coverage as $20,000; that same day, Kastel emailed and faxed a corrected application listing $1 million in UM coverage. (Joint Ex. 7-9).

20.  Elliott noticed that Kastel's correspondence stated the Policy was a Non-Trucking Liability Policy but he nevertheless thought the Policy would provide UM coverage while he was driving under load. (Trial Tr. Sept. 11, 2012, at 28:18-25).

21. Rodholm faxed the executed application to Kastel on December 18, 2009. (Joint Ex. 10). Kastel did not recall Rodholm or Elliott stating they didn't understand the application or asking questions about it. (Trial Tr. Sept. 10, 2012, at 164:11-15). Rodholm did not recall having any questions about the application when she signed it. (Id. at 86:23-24, 89:16-19).

22. The insurance certificate Kastel emailed to Rodholm on December 21, 2009, stated the "non-trucking coverage if provided below will only apply while insured is under permanent lease to Sherwin Williams transport." (Joint Ex. 13).

23. Rodholm only glanced at the documents and did not know if she noticed that the insurance certificate states that it is for a Non-Trucking Liability Policy. (Trial Tr. Sept. 10, 2012, at 280:5-13). Elliott initially testified that he did not read the insurance certificate and consequently did not notice that it was a Non-Trucking Liability Policy. (Id. at 101:12-14, 101:22-25). He further testified that he would not have been concerned because the Department of Transportation accepts that type of form and he would be "okay" with that type of policy. (Id. at 102:11-13, 103:8-10, 103:17-24). Later,

however, he testified that he noticed that it said non-trucking liability and never asked what that meant. (Trial Tr. Sept. 11, 2012, at 56:11-21).

24. The Non-Trucking Liability Policy was bound on December 24, 2009, and had a total premium of $225.26 a month. (Joint Ex. 10). Both Defendants testified that they thought this premium was reasonable. (Trial Tr. Sept. 10, 2012, 281:8-13, 281:25-282:1; Trial Tr. Sept. 11, 2012, 8:3-12, 34:9-17, 45:18-20).

25. The Policy's declaration page states in bold letters that it is a Non-Trucking Liability Policy and contains a picture of a truck surrounded by a circle with a diagonal line through it. Both Defendants testified that they did not notice this symbol. (Trial Tr. Sept. 11, 2012, at 18:19-22, 58:7-13).

26. Elliott initially testified that when the Policy arrived he did not even look at it. (Trial Tr. Sept. 10, 2012, at 104:10-16, 104:22-105:2). However, he later stated that he reviewed it and made sure it contained what he had discussed with Kastel. (Trial Tr. Sept. 11, 2012, at 56:24-57:3).

27. Elliott stated that he did not know that Sherwin Williams' $3 million primary liability policy provides

coverage for Sanchuk's tractor when it is connected to Sherwin Williams' trailer. (<u>Id.</u> at 52:4-18).

28. On August 17, 2010, Elliott was injured in an accident while operating the truck under load for Sherwin Williams. (Trial Tr. Sept. 10, 2012, at 36:8-15). He contacted Jeff Enneking at Great American, an adjuster who handles collision damage to trucks. (Trial Tr. Sept. 11, 2012, at 39:11-18). After realizing Elliott wanted UM coverage, Ennecking contacted Jon Carnes in the non-trucking liability claims department. (<u>Id.</u> at 60:15-16, 61:14-20). Elliott testified that instead of contacting Great American about his UM claim he hired attorney Ken Podor, who contacted Great American. (<u>Id.</u> at 46:16-19, 62:1-5).

29. Tim Clinton, who has expertise in non-trucking liability insurance, testified that no insurance company provides UM coverage regardless of whether the driver is under load. (Trial Tr. Sept. 10, 2012, at 61:9-18, 73:7-13). Accordingly, Clinton testified that if Sanchuk wanted UM coverage while under load, Sherwin Williams would have to provide that type of coverage on its primary liability policy. (<u>Id.</u> at 61:9-62:1, 62:14-21). Sherwin Williams' primary liability policy covered both Sherwin Williams'

-12-

trailer and Sanchuk's tractor when it was connected to the trailer. (Def. Ex. 11).

30. Clinton testified that the UM coverage endorsement to the Great American policy could not stand on its own and needed to be read in conjunction with the policy. (Trial Tr. Sept. 10, 2012, at 57:9-11). He further testified that, in order to be effective, the UM endorsement must be attached to a coverage form, in this case the Non-Trucking Liability Policy. (Id. at 77:15-22).

31. Although the UM coverage endorsement refers to "motor carrier coverage form" or "truckers coverage form" rather than "non-trucking liability," Clinton explained that Great American changed the name of the coverage form; however, the language of the policy, which is standard in the industry, remained the same as the truckers coverage form. (Id. at 67:20-25, 68:21-69:4).

32. Clinton testified that the UM endorsement is not broader than the coverage form. (Id. at 58:25-59:6, 77:7-14). The UM endorsement states that "the provisions of the coverage form apply unless modified by the endorsement." (Joint Ex. 2 at 33).

33.  Clinton testified that the UM endorsement in this case
     does not modify the Policy's Trucking or Business Use
     Exclusion. (Trial Tr. Sept. 10, 2012, at 59:7-11).

**III. Conclusions of Law**

The Court makes the following conclusions of law. To the
extent that any conclusions of law might constitute findings
of fact, they are adopted as such.

    A.   **No Coverage Exists under the Great American Policy**

The Defendants have asserted that the Trucking or
Business Use Exclusion to the Policy at issue in this matter
is ambiguous. They have further argued that the Trucking or
Business Use Exclusion does not apply to the UM endorsement to
the Policy. For the reasons discussed below, the Court rejects
these arguments.

"Under Florida law, an insurance policy is treated like
a contract, and therefore ordinary contract principles govern
the interpretation and construction of such a policy."
Fabricant v. Kemper Indep. Ins. Co., 474 F. Supp. 2d 1328,
1330 (S.D. Fla. 2007). A court's inquiry therefore "begins
with a review of the plain language of the insurance policy as
bargained for by the parties." Koikos v. Travelers Ins. Co.,
849 So. 2d 263, 266 (Fla. 2003).

-14-

If policy language is susceptible to more than one reasonable interpretation, the policy is considered ambiguous. Auto Owners Ins. Co. v. Anderson, 756 So. 2d 29, 34 (Fla. 2000). Ambiguous policy provisions are interpreted liberally in favor of the insured and strictly against the insurer, and exclusionary clauses are construed more strictly against the insurer than coverage clauses. Certain Underwriters at Lloyd's London v. Karma Korner, No. 6:10-cv-830-Orl28GJK, 2011 WL 1150466, at *2 (M.D. Fla. Mar. 28, 2011).

However, "[t]he mere fact that an insurance contract is complex and requires some analysis to interpret it does not, by itself, render the agreement ambiguous." Swire Pac. Holdings, Inc. v. Zurich Ins. Co., 845 So. 2d 161, 165 (Fla. 2003). "[I]f a policy provision is clear and unambiguous, it should be enforced according to its terms whether it is a basic policy provision or an exclusionary provision." Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co., 913 So. 2d 528, 532 (Fla. 2005).

This case involves a Non-Trucking Liability Policy. Such policies typically provide coverage "only when the [covered] tractor is being used without a trailer or with an empty trailer, and is not being operated in the business of an

authorized carrier." <u>Meade v. Great Am. Assur. Co.</u>, 198 F. App'x 475, 478 (6th Cir. 2006).

The Non-Trucking Liability Policy in this case states that it expressly excludes coverage "while the covered auto is being used in the business of a lessee or while the covered auto is being used to transport cargo of any type." (Part II, C. Exclusions, 13, Joint Ex. 2, at 15). Furthermore, the Policy unambiguously states that UM coverage is not included. (Part III, <u>Id.</u> at 16). It is undisputed that the accident at issue in this case occurred while Elliott was operating his truck under load. The Court thus finds, consistent with holdings in other jurisdictions, that the Great American Policy unambiguously excludes coverage for Elliott's accident. <u>See</u> <u>Meade</u>, 198 F. App'x at 478; <u>Great Am. Assur. Co. v. Ford</u>, 2009 WL 2487085, at *5 (M.D. Pa. Aug. 12, 2009).

Having found that the Trucking or Business Use Exclusion is unambiguous, the Court now considers whether that exclusion applies to the UM endorsement. The Defendants assert that the endorsement does not incorporate by reference the Non-Trucking Liability Policy sold to Sanchuk. Instead, the endorsement references other types of policies. (Joint Ex. 2 at 33). The UM endorsement does not exclude trucking or business use, and the Policy applies the exclusions in Part II to any UM

-16-

coverage imposed "by law." (Part III, Id. at 16). The Defendants thus contend that the Policy's Trucking or Business Use Exclusion does not apply to the separately purchased UM coverage.

"[I]n construing insurance policies, courts should read each policy as a whole, endeavoring to give every provision its full meaning and operative effect." Shaw v. Nat'l Fire Ins. Co., 605 F.3d 1250, 1252 (11th Cir. 2010) (internal quotations and citations omitted). Here, the UM endorsement states that "[w]ith respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement." (Joint Ex. 2 at 33). The endorsement must be considered in conjunction with the Non-Trucking Liability Policy (the Coverage Form).[2] Nothing in the UM endorsement modifies the Trucking or Business Use Exclusion of that Policy. The Court finds that the Trucking or Business Use Exclusion applies to the endorsement and no UM coverage

---

[2] That the UM endorsement does not expressly refer to a "Non-Trucking Liability Policy" is of no moment. Tim Clinton testified credibly that Great American had simply changed the title of the policy, and that the policy still used the same standard language as the "Motor Carrier Coverage Form" and/or "Truckers Coverage Form" referenced by the endorsement. Those forms are non-trucking liability policies. The Court finds that the "Coverage Form" referenced in the endorsement is the Non-Trucking Liability Policy issued to Sanchuk.

exists under the Policy for Elliott's accident. See Meade v. Great Am. Assur Co., 2005 WL 2304749 (E.D. Ky. Sept. 20, 2005); Steele v. Great West Cas. Co., 540 N.W.2d 886 (Minn. App. Dec. 12, 1995).

The Defendants' argument that the UM endorsement can stand on its own as a separate policy is without merit. Under Florida law, an insurance policy is "a written contract of insurance . . . by whatever named called, and includes all clauses, riders, endorsements, and papers which are a part thereof." Fla. Stat. § 627.402. Giving the plain language of that statute a commonsense reading, the Court determines that the UM endorsement is a part of the Policy, not a contract unto itself. Courts in other jurisdictions have reached the same conclusion regarding endorsements. See e.g. Kay-Lex Co. v. Essex Ins. Co., 649 S.E.2d 602, 607 n.1 (Ga. App. 2007) ("Endorsements are not considered a part of the 'face of the policy.'"); Fireman's Fund Ins. Co. v. CNA Ins. Co., 862 A.2d 251, 258 (Vt. 2004) ("An endorsement is a writing added or attached to a policy which either expands or restricts the insurance in the policy. It becomes a part of the contract when it is issued.").

In sum, the Court finds that the Non-Trucking Liability Policy issued to Sanchuk by Great American does not provide UM

coverage for Elliott's accident. The Court will now turn to the Defendants' equitable theories.

**B.    <u>Kastel Did Not Act as Great American's Agent</u>**

Sanchuk and Elliott contend that Kastel, an employee of Wellington F. Roemer Insurance Agency, was the apparent agent of Great American. Based upon the evidence adduced at trial, however, the Court finds that the Roemer Insurance Agency is an independent insurance broker that acted on behalf of the Defendants in procuring the Policy.

Apparent agency "exists only if each of the following three elements is present: 1) a representation by the purported principal; (2) reliance on that representation by a third party; and (3) a change in position by the third party in reliance upon such representation." <u>Ocana v. Ford Motor Co.</u>, 992 So. 2d 319, 326 (Fla. 3d DCA 2008). "The reliance of a third party on the apparent authority of the principal's agent must be reasonable and rest in the actions of or appearances created by the principal and not by agents who often ingeniously create an appearance of authority by their own acts." <u>Blunt v. Tripp Scott, P.A.</u>, 962 So. 2d 987, 989 (Fla. 4th DCA 2007) (internal quotations and citations omitted).

In insurance, "[t]he general rule is that an independent agent or broker acts on behalf of the insured rather than the insurer." Steele v. Jackson Nat'l Life Ins. Co., 691 So. 2d 525, 527 (Fla. 5th DCA 1997). "[A] broker is usually employed by the insured for the specific purpose of procuring, with some insurance company, a policy of insurance." Amstar Ins. Co. v. Cadet, 862 So. 2d 736, 740 (Fla. 5th DCA 2003). However, the Florida Supreme Court has recognized an exception for insurers "who cloak unaffiliated insurance agents with sufficient indicia of agency to induce a reasonable person to conclude that there is an actual agency relationship." Almerico v. RLI Ins. Co., 716 So. 2d 774, 783 (Fla. 1998).

Sanchuk and Elliott argue that Kastel provided an application for insurance on Great American letterhead listing the Roemer Insurance Agency as an "agent" for Great American. She provided no applications for any other insurance company, and had actual authority to bind the Policy issued to Sanchuk.[3] However, these factors are insufficient indicia of agency to induce a reasonable person to conclude that Kastel

_____

[3] Kastel testified that she does not always obtain quotes from all three carriers she deals with because Great American provides quotes the quickest, "and on many occasions, the quicker you can quote somebody, that's what they want." (Trial Tr. Sept. 10, 2012, at 160:21-22).

-20-

acted as the agent of Great American rather than as an independent insurance broker.

The Roemer Insurance Agency writes non-trucking liability policies for multiple companies and has only limited binding authority on behalf of Great American. This is not the mark of an insurance agent, "who is contractually obligated to work for and solicit insurance on behalf of a specific insurance company." Amstar Ins. Co., 862 So. 2d at 740. An insurance broker, such as the Roemer Agency, "is not bound by contract to work for or solicit insurance for any particular insurance company" but instead "act[s] as a conduit or middleman between the insured and one of many insurers." Id. at 739.

Kastel's relationship with the Defendants is indicative of an insurance broker as well. Kastel worked with Elliott for several weeks to determine the type of coverage, policy limits, and whom the Defendants wanted to be insured. Once the Defendants obtained the coverages they requested, Kastel printed and mailed to them the insurance certificate and policy. Thereafter, she collected the premium payments on their behalf. Each of these facts supports the Court's conclusion that Kastel was acting as an agent of the Defendants and not as the agent of Great American.

### B.   <u>Promissory Estoppel</u>

In their Counterclaim, the Defendants seek the equitable relief of promissory estoppel. "The general rule is that estoppel may not be invoked to enlarge or extend the coverage specific in an insurance contract." <u>Solar Time Ltd. v. XL Specialty Ins. Co.</u>, 142 F. App'x 430, 433-34 (11th Cir. 2005) (internal quotations and citations omitted). However, the Florida Supreme Court has recognized a narrow exception to this rule under which coverage may be created through promissory estoppel "where to refuse to do so would sanction fraud or other injustice." <u>Crown Life Ins. Co. v. McBride</u>, 517 So. 2d 660, 662 (Fla. 1987). To state a cause of action for promissory estoppel, Sanchuk and Elliott must establish "(1) a representation as to a material fact that is contrary to a later-asserted position; (2) a reasonable reliance on that representation; and (3) a change in position detrimental to the party claiming estoppel caused by the representation and reliance thereon." <u>FCCI Ins. Co. v. Cayce's Excavation, Inc.</u>, 901 So. 2d 248, 251 (Fla. 2d DCA 2005).

The burden of proof is clear and convincing evidence. <u>Universal Underwriters Ins. Co. v. Abe's Wrecker Serv., Inc.</u>, 564 F. Supp. 2d 1350, 1356 (M.D. Fla. 2008). "[T]o support a finding of equitable estoppel the facts necessary to

-22-

constitute it must be shown with certainty and not taken by argument or inference, nor supplied by intendment, but clearly and satisfactorily proved. This is a significantly higher degree of proof than by the greater weight of the evidence." Id. (quoting Crown Life Ins., 517 So. 2d at 664).

The Counter-Plaintiffs have not met their burden. Although Elliott contends that Kastel said he would be covered at all times, Kastel disputed this claim with testimony regarding her general practices. She testified that she never would have informed Elliott that the UM endorsement would provide coverage while he was driving under load. Furthermore, courts have questioned whether such comments are sufficiently definite to constitute a representation of coverage. In Professional Underwriters Insurance Co. v. Freytes & Sons Corp., the court held that a similar remark made by a broker was not a material representation. 565 So. 2d 900, 903 (Fla. 5th DCA 1990). There, the agent told the insured that it had "what it needed." The court found that the statement "does not rise to the level of specificity required to be a representation . . . of coverage." Id.

Great American offered an alternative explanation of such a statement, assuming it was made. Sherwin Williams' primary policy provided Elliott with coverage while driving for

business purposes, and the Non-Trucking Liability Policy covered him when he was not driving under load. That Elliott may not have understood the inference of the alleged remark does not make it a misrepresentation. "It may be that this insured did not know much about commercial insurance, but he did have an obligation to know about his business . . . and take reasonable steps to insure himself." Id. Based upon the foregoing analysis, the Court finds that the Counter-Plaintiffs have failed to establish the first prong of their promissory estoppel claim.

The Counter-Plaintiffs next contend that Kastel had a duty to tell them that Elliott would not be covered under Great American's policy while driving under load. They further assert that had they known the UM endorsement would not provide coverage while driving under load they would have sought other coverage.

However, promissory estoppel "cannot apply in a case such as this where one party has made an assumption based on the other party's failure to act." Travelers Indem. Co. v. Billue, 763 So. 2d 1204, 1204 (Fla. 1st DCA 2000). Furthermore, estoppel by silence does not exist where the claimant "had actual knowledge of the facts or the means of acquiring knowledge. One may not fail to avail himself of readily

accessible sources of information and rely on the silence of another who has been guilty of no act calculated to induce the party claiming ignorance to refrain from investigating." Ennis v. Warm Mineral Springs, Inc., 203 So. 2d 514, 520 (Fla. 2d DCA 1967).

In the insurance context, "an insured has a duty to take certain steps for its own protection such as reading their policies, certificates of insurance or any cancellation notices in their possession." Admiral Ins. Co. v. Crescent Hills Apartments, 328 F.3d 1310, 1312 (11th Cir. 2003). "[A] reasonable person has no right to shut his eyes or ears to avoid information, and then say he has no notice . . . . Similarly, an insured cannot avoid liability for a provision in an insurance [policy] he claims he did not read." Citizens Prop. Ins. Corp. v. European Woodcraft & Mica Design, 49 So. 3d 774, 777-78 (Fla. 4th DCA 2010) (internal quotations and citations omitted).

In this case, the Counter-Plaintiffs cannot reasonably have believed Great American's Policy would provide coverage while the vehicle was under load. In her email correspondence with Elliott, Kastel repeatedly referred to a non-trucking policy. The certificate of insurance and the policy itself unambiguously state that it is a non-trucking policy that

excludes coverage for business use. If that were not enough, the policy has a photo of a truck in a circle with a bar through it. Kastel was under no obligation to state the obvious--that the policy did not provide coverage under load.

The Counter-Plaintiffs, on the other hand, were obliged to read the documents before them and take steps to protect their interests. Although they argue that they lack knowledge regarding terms such as "non-trucking liability," they failed to inquire as to what those terms mean.

Sanchuk and Elliott claim that it was reasonable to believe the Policy would provide coverage under load because Elliott told Kastel that he only drove the truck under load and the initial application did not reference non-trucking liability. They further contend that the Policy, as issued, was worthless to them. However, Elliott conceded that such a policy was required under his contract with Sherwin Williams. In any event, the documents placed into evidence overwhelmingly state that the Policy included a Trucking or Business Use Exclusion. The Court finds that Sanchuk and Elliott cannot invoke estoppel by silence based upon their failure to avail themselves of the information at hand.

Finally, the Counter-Plaintiffs have not shown detrimental reliance as to Kastel's actions or inactions.

Although they contend that they would have sought 24/7 UM coverage, Clinton testified that such coverage was not available in the marketplace. Sanchuk and Elliott note Clinton's statement that "there is always an exception." (Trial Tr. Sept. 10, 2012, at 74:5-7). Nevertheless, the Counter-Plaintiffs failed to introduce evidence that such coverage does indeed exist, and such failure is fatal to their detrimental reliance claim. See State Farm Fire & Cas. Ins. Co. v. Ortiz, 560 So. 2d 1350, 1351 (Fla. 3d DCA 1990) (finding no detrimental reliance notwithstanding the insureds' claim that they would have sought alternative coverage because "they failed to place in evidence any proof that they would have, or even could have, qualified for and secured such coverage").

The Counter-Plaintiffs have failed to show a material representation by Kastel, or reasonable reliance on that representation to their detriment. The Court holds that Sanchuk and Elliott are not entitled to coverage through promissory estoppel.

### C. **Policy Reformation**

Sanchuk and Elliott have further sought to have this Court reform the Policy so that it provides UM coverage while under load. As with promissory estoppel, the Counter-

Plaintiffs face a high evidentiary bar. "The applicable rule for reformation is that the evidence must be clear and convincing and sufficient to overcome a strong presumption arising from the policy that it correctly expresses the intention of the parties." Niagara Fire Ins. Co. v. Allied Elec. Co., 319 So. 2d 594, 595 (Fla. 3d DCA 1975). Furthermore,

> [t]he evidentiary standard of clear and convincing evidence in the context of reformation contemplates testimony from a credible witness who testifies to facts that are distinctly remembered and the details thereof narrated exactly and in due order and that the testimony be clear, direct and weighty and convincing, so as to enable you to come to a clear conviction without hesitancy of the truth of the precise facts and issue.

Universal Underwriters, 564 F. Supp. 2d at 1356-57. "Rigorous application of the higher standard of proof in reformation cases promotes the policy that parties should not be subjected to contractual obligations to which they never agreed." USAA Cas. Ins. Co. v. Threadgill, 729 So. 2d 476, 478 (Fla. 4th DCA 1999).

The equitable relief of policy reformation rests on a mutual and common mistake by the parties to the agreement. Universal Underwriters, 564 F. Supp. 2d at 1356. "A mistake on one side may be a ground for rescinding, but not reforming, a contract." Fidelity Phenix Fire Ins. Co. of New York v.

-28-

Hilliard, 62 So. 585, 586 (Fla. 1913). Reformation, by contrast, requires a showing "that the parties agreed on one thing and when they put it in the contract they said something different." Blumberg v. Am. Fire & Cas. Co., 51 So. 2d 182, 184 (Fla. 1951). Thus, the Counter-Plaintiffs must show that they and Kastel both agreed to one thing but the Policy says something else.

They have not done so. Kastel testified that she would not have told Elliott that the UM endorsement provided coverage while under load because she knew that was not true. That Elliott assumed such coverage existed or was mistaken as to the coverages provided by the Policy does not give rise to a claim for reformation. See Stevens v. Ill. Cent. R.R. Co., 234 F.2d 562, 563 (5th Cir. 1956) (holding that an individual who failed to read an agreement could not rely on a unilateral mistake to obtain reformation).

Sanchuk and Elliott contend that Kastel knew the truck was driven only under load, therefore Kastel failed to issue a policy providing the appropriate coverage. They cite several extrajurisdictional cases from the 1970s for the proposition that such failure amounts to mutual mistake. The Court is not convinced that Kastel made a mistake, however. She testified that drivers such as Elliott frequently purchase non-trucking

policies even if they only operate their trucks under load because their motor carrier requires it, as was the case for Elliott. The evidence simply does not support Sanchuk and Elliott's contention that Kastel knew Elliott wanted 24/7 UM coverage and failed to procure the desired policy. The Court therefore finds that the Counter-Plaintiffs are not entitled to the equitable relief of policy reformation.

IV. **Conclusion**

The Court finds that the Non-Trucking Liability Policy issued to Sanchuk includes a Trucking or Business Use Exclusion that excludes coverage for any accident that occurs while the covered vehicle is under load. This exclusion extends to the UM endorsement. At the time of the accident, Elliott was operating the covered tractor for business purposes. Accordingly, Great American has no obligation to provide Elliott with UM coverage. Therefore, the Court finds that declaratory judgment should be rendered in favor of Great American and against Sanchuk and Elliott.

Kim Kastel of the Wellington F. Roemer Insurance Agency acted as the agent of Sanchuk and Elliott in procuring the Policy. Sanchuk and Elliott did not prove, by clear and convincing evidence, that Kastel made a material representation as to the coverage supplied by the Policy, or

that Sanchuk and Elliott reasonably relied on any such representation to their detriment. Thus, they are not entitled to coverage by promissory estoppel. Sanchuk and Elliott did not provide clear and convincing evidence that a mutual mistake warrants policy reformation. Therefore, the Court finds that judgment should be rendered in favor of Great American and against Sanchuk and Elliott as to the Amended Counterclaim.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED**:

(1) The Clerk is directed to enter **JUDGMENT** in favor of Great American Assurance Company and against Sanchuk, LLC and Chuck Elliott.

(2) Thereafter, the Clerk is directed to terminate all pending deadlines and motions and **CLOSE THIS CASE**.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this <u>26th</u> day of October, 2012.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies:   All Counsel of Record

-31-